United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 19, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 02-50028
_____

U.E. TEXAS ONE-BARRINGTON, LTD., ET AL.

                                               **Plaintiffs**

U.E. TEXAS ONE-BARRINGTON, LTD.

                                      **Plaintiff - Appellant**

                         **versus**

GENERAL STAR INDEMNITY COMPANY; FIREMAN'S FUND INSURANCE COMPANY OF
OHIO,

                                **Defendants-Appellees.**

_____

Appeal from the United States District Court
for the Western District of Texas
_____

Before JONES, SMITH and SILER[1], Circuit Judges.

EDITH H. JONES, Circuit Judge:

         Appellant U.E. Texas One-Barrington, Ltd. ("Texas One")

appeals the district court's grant of summary judgment in favor of

appellees General Star Indemnity Company ("General Star") and

_____

         [1]Judge of the United States Court of Appeals for the Sixth
Circuit, sitting by designation.

1

Fireman's Fund Insurance Company ("Fireman's Fund") on its claims for insurance coverage relating to damage to the Oak Meadow Apartment complex caused by water leaking from the plumbing system. On appeal, Texas One argues that the district court erred in holding that (1) General Star is not liable for access costs because the damage caused by long-term water leaks are not covered water damage under the General Star policy and (2) the plumbing leaks under each building are, as a matter of law, "separate occurrences" for purposes of determining deductibles under the Fireman's Fund excess coverage policy. Finding no reversible error, we affirm.

## BACKGROUND

Texas One, at all times relevant to this suit, owned the Oak Meadow Apartments complex ("Oak Meadows") in San Antonio, Texas. Oak Meadows, built in 1974, consists of thirty residential buildings, three office buildings, and other facilities. Each residential building contains at least four separate apartments. General Star insured Oak Meadow pursuant to a commercial property policy effective from October 21, 1995 to October 21, 1996. Fireman's Fund provided excess coverage pursuant to a commercial excess property policy effective from October 21, 1995 to October 21, 1996. Around October 1, 1996, Texas One discovered that several of the buildings had suffered foundation movement and above ground damage. The foundation movement and damage resulted from

2

moisture changes in the soil beneath the foundations. Although the cause of these moisture changes remains disputed, tests revealed that nineteen buildings in the complex had experienced plumbing leaks. Texas One admits that it does not know when any of the leaks began. The parties agree that the leaks existed continuously and repeatedly for more than 14 days prior to discovery of the damage. The parties also stipulated that the leaks under any particular building foundation at the property only affected the foundation of that particular building and did not contribute to the movement of any other building foundation at the property nor did they cause any other plumbing leaks.

In November 1999, Texas One filed suit in Texas state court against General Star and Fireman's Fund for breach of contract arising out of the insurers' refusal to pay on Texas One's claims. General Star and Fireman's Fund removed the case to federal court and subsequently moved for summary judgment.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment de novo. Hodges v. Delta Airlines, Inc., 44 F.3d 334, 335 (5th Cir. 1995)(en banc). Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Hunt v. Cromartie, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143

3

L. Ed. 2d 731 (1999); <u>see also</u> Fed. R. Civ. P. 56(c).  If the moving party meets its burden, the non-movant must designate specific facts showing there is a genuine issue for trial.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## DISCUSSION

<u>General Star</u>

Texas One argues that General Star was obliged to pay for costs incurred by Texas One in accessing the plumbing system for repair.  Texas One raises two arguments in support of its claim: (1) that the language of the General Star policy requires payment of Texas One's access costs even though payment for the damage caused by the leaks is barred under an exclusionary clause and (2) that General Star admitted that it was obliged to pay for the access costs because it made a partial payment on Texas One's access cost claims.  Texas One's arguments are without merit.  This court recently addressed Texas One's arguments in a case interpreting policy language identical to the language at issue in this case and held that access costs were not recoverable. <u>See</u> <u>Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.</u>, 288 F.3d 651, 656 (5th Cir. 2002).

<u>Fireman's Fund</u>

4

Texas One also contends that the district court erred in determining that the damage to each of the nineteen buildings is a separate occurrence under the Fireman's Fund excess coverage policy for which Texas One must pay nineteen deductibles. Texas One argues that although each building was damaged by different leaks, there is still only one occurrence for purposes of the Fireman's Fund policy. Texas One's argument rests upon its contention that all of the leaks can be traced back to defects in the materials and installation of the underground plumbing system. The Fireman's Fund policy, in pertinent part, provides:

> This Company shall be liable in respect of each and every loss occurrence, irrespective of the number and kinds of risks involved, for 100% of the ultimate net loss excess over and above $1,000,000 ultimate net loss to the Insured in each and every loss occurrence.
> * * *
> The term loss occurrence means the total loss by perils insured against arising out of a single event. When the term applies to loss or losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake, volcanic eruption, riots, riots attending a strike, civil commotion, and vandalism and malicious mischief, a single event means all losses whenever occurring which directly results from such perils during a continuous period of 72 hours.

The policy provides for a maximum payout of $13,267,000 per occurrence.

The damage to the nineteen buildings resulted in more than $1,000,000 net loss to Texas One. However, the damage to any one building did not exceed $1,000,000. Thus, we are called upon to interpret the term "occurrence" and determine whether the damage

5

to the nineteen buildings constitutes one occurrence (resulting in one deductible) or nineteen occurrences (resulting in nineteen deductibles).

Neither party contends that "occurrence" is ambiguous in this contract nor that our determination of the number of occurrences hinges on resolution of a factual dispute. Thus, the interpretation of "occurrence" as used in the contract is a question of law. Ran-Nan Inc. v. General Accident Ins. Co., 252 F.3d 738, 739 (5th Cir. 2001) (per curiam). Under Texas law, "the proper focus in interpreting 'occurrence' is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects."[2] Id. at 740 (quoting

---

[2]The dissent goes to substantial effort to distinguish cases defining "occurrence" in general liability policies from "occurrence" in property loss policies. Even if the dissent's policy arguments are correct, however, this court has already rejected any such distinction. In Ran-Nan Inc., we stated that

> General Accident contends that decisions utilizing "cause" analysis such as H.E. Butt and Maurice Pincoffs are distinguishable as construing general liability insurance policies instead of employee dishonesty insurance policies. Not only does the company neglect to cite any authority supporting this contention, but it also fails to explain why, in determining the number of "occurrences", employee dishonesty policies are different than general liability policies. It is true that no Texas case specifically applies "cause" analysis to employee dishonesty policies, but this widely accepted method for calculating the number of "occurrences" is consistent with the general principles of Texas law.

252 F.3d at 740. For present purposes, employee dishonesty policies are indistinguishable from property loss policies.

6

H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co., 150 F.3d 526, 530 (5th Cir. 1998)).

In understanding how to apply this test, we are guided by a prior decision applying Texas law to a policy containing language similar to that found in the Fireman's Fund policy. Goose Creek Consol. I.S.D. v. Cont'l Cas. Co., 658 S.W.2d 338 (Tex. App. -- Houston [1st Dist.] 1983, no writ) dealt with two fires occurring at two different schools at different locations and at different times. The insurance policy in Goose Creek stated that a "loss occurrence" referred to "the total loss by perils insured against arising out of a single event." Id. at 340. This is the same definition found in the Fireman's Fund policy. Hoping to pay only one deductible, the school district sought to prove that the damages arose from the work of a single arsonist on a single morning. The court held that regardless of the presence or absence of a single arsonist, there were two "occurrences" as a matter of law due to "the fact that two fires distinguishable in space and time occurred and that one did not cause the other." Id. at 341. Similarly, Texas One's property experienced multiple leaks distinguishable in space and time.[3]

---

[3]And as noted previously, the parties have stipulated that the damage to each building was caused by leaks under that particular building and that each leak had no effect on any other building.

7

Goose Creek instructs us not to look to any overarching cause, but rather to focus on the event that gave rise to Fireman's Fund's liability under the policy. For example, in Goose Creek the court did not look to the existence of a single arsonist, but rather to the number of fires that caused the buildings to burn. Thus, in determining the number of "occurrences" under the Fireman's Fund policy, we should not focus on the alleged overarching cause, but rather on the specific event that caused the loss. In this case the losses arose when the pipes broke, not when they were installed. The parties have stipulated that a different leak was responsible for the damage to each building, and as such we agree with the district court that each leak constitutes a separate occurrence as a matter of law.

To point to the installation of the pipes as the single event which gave rise to the damage to the nineteen buildings proves too much. Of course it is true that had the plumbing system never been installed the leaks would not have occurred. In this sense, it is true that the leaks which independently damaged the nineteen buildings arose from the same event. However, to look this far back would render any damage to the complex occurring at any time related to the plumbing as arising from the same event.

Since no one building suffered a $1,000,000 net loss, Texas One has not met the $1,000,000 per occurrence threshold to recover under the Fireman's Fund policy. Therefore, the district

8

court was correct in granting summary judgment in favor of Fireman's Fund.

## CONCLUSION

Upon review of the record, we find that summary judgment in favor of General Star was proper in light of this court's decision in <u>Unity</u>. Furthermore, summary judgment in favor of Fireman's Fund was proper because the net loss attributable to each occurrence was less than the deductible under the policy. Finding no reversible error, we AFFIRM.

**AFFIRMED.**

9

JERRY E. SMITH, Circuit Judge, concurring in part and dissenting in part:

Texas One has raised a fact question as to whether the damage to its buildings constituted one or nineteen loss occurrences under the Fireman's Fund excess coverage policy. I disagree with the majority's reliance on caselaw involving liability policies and with the result it reaches by employing this approach. Accordingly, I respectfully dissent from the portion of Judge Jones's excellent and careful opinion that deals with Fireman's Fund.

I.

A.

Texas law takes a slightly different approach for determining the number of "occurrences" under policies designed to protect the insured from liability to others ("liability policies") from the approach it takes for determining the number of "loss occurrences" under policies designed to protect the insured from damage or loss to property owned by the insured ("loss policies"). For loss policies, Texas courts apply a "cause" test, which determines the number of loss occurrences based on the number of events that caused the loss or losses at issue. *Goose Creek Consol. Indep. Sch. Dist. v. Continental Cas. Co.*, 658 S.W.2d 338, 340-41 (Tex. App.SSHouston [1st Dist.] 1983, no writ). For liability policies, the number of occurrences is determined by finding the number of "events or inci-

dents for which [the insured] is liable." *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206 (5th Cir. 1971). This approach has been described as the "liability-triggering event" test.[4]

The approach to be employed is determined by the type of injury at issue. The injury insured against under a loss policy is direct physical damage to or loss of property, and the number of occurrences is determined not by the number of losses or types of damage, but by the number of events that caused loss and/or damage. Liability policies operate only when the insured has a civil liability to one or more nonparties. The injury is the liability, and therefore courts look for the number of events that cause liability.

The "liability-triggering event" test may be viewed as a specialized application of the "cause" test. The court still looks

---

[4]*H. E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 535 (5th Cir. 1998) (Benavides, J., concurring). Texas state courts have adopted the *Pincoffs* approach in liability policy cases. *See, e.g., State Farm Lloyds, Inc. v. Williams*, 960 S.W.2d 781, 784-85 (Tex. App.§§Dallas 1997, writ dism'd by agr.) (relying on *Pincoffs* in finding that three random gunshots fired by one person constituted three occurrences because they caused three liability-triggering injuries); *but see Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 334 & n.3 (Tex. App.§§San Antonio 1997, writ denied) (finding that multiple passes by a crop duster together formed one occurrence and distinguishing *Williams* because the *Williams* policy did not define occurrence, whereas the definition of occurrence found in the policy at issue included "repeated exposure to [the same general] conditions").

11

to the cause of the injury, but the injury insured against is liability, not property damage or theft. Whenever an insured party is liable to other parties for civil damages, there often will be contemporaneous and related injuries to the insured and to other parties. The test crafted by *Pincoffs* focuses the inquiry on the relevant injury and prevents the court from being distracted by these other injuries.

Consideration of the facts of *Pincoffs* elucidates this distinction. Pincoffs, the insured, bought a large amount of contaminated birdseed and sold it to eight dealers, *Pincoffs*, 447 F.2d at 205, who then sold it to numerous bird owners, killing many pets. The aggrieved bird owners made claims against their respective dealers, not against Pincoffs directly. The dealers then made claims against Pincoffs, which in turn sought coverage under its liability policy. *Id*. We concluded that there had been eight occurrences, because there were eight sales that caused Pincoffs's liability for the  type of injury protected under the policy.

Because liability was the injury insured against, "[i]f Pincoffs had destroyed the seed before sale, for instance, there would be no occurrence at all for which the insured would be liable." *Id*. at 206. But under a loss policy covering loss or spoilage of inventory, the destruction of the seed before sale would not have prevented the occurrence of an insurable event. The

12

loss occurrence would have been the event that contaminated the birdseed, or, if it was already contaminated before Pincoffs received it, the occurrence would have been Pincoffs's purchase of the seed. Any subsequent sales of the birdseed would have been irrelevant to determining the number of loss occurrences.

For the above reasons, cases that determine the number of occurrences under liability policies have *limited applicability* when determining the number of loss occurrences under loss policies. Characteristics unique to liability policies determine what losses are relevant. Even under otherwise identical facts, insurance policies, depending on their purposes and definitions employed, may focus on different losses or interpret the underlying events differently.[5]

B.

Twice recently, this court inadvertently has brought confusion to this area by citing caselaw employing both the liability

---

[5]Definitions of "occurrence" under liability policies tend to be similar to each other and dissimilar to the definitions of "loss occurrence" under loss policies. These variances in the meanings of key terms may advise different outcomes to otherwise similar cases. *See Foust*, 975 S.W.2d at 334; *see also Goose Creek*, 658 S.W.2d at 340 ("[B]oth parties have cited numerous cases touching upon "accident" or "occurrence," but many of the cases do not define these terms, and no case has been cited or found which attempted to define "single event." We conclude that all cases cited are distinguishable from the instant case and that no useful purpose would be served by discussing the holdings of these cases.").

policy and loss policy approaches, without noting the type of policy at issue. *See H.E. Butt*, 150 F.3d at 530 (interpreting a liability policy); *Ran-Nan Inc. v. Gen. Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001) (per curiam) (interpreting a policy covering losses caused by employee dishonesty). Neither case, however, mandates the approach taken by the majority.

In *H.E. Butt*, 150 F.3d at 528, we considered the number of occurrences under a liability policy for abuse of children by an employee of insured's grocery store. Though the *H.E. Butt* majority cited cases employing both approaches, including *Pincoffs* and *Goose Creek*, *id*. at 530, it appears to have applied a "cause" test. It determined that there had been two occurrences, because the "immediate cause[s]" of the two injuries were separate incidents committed on two different days. *Id*. at 531, 535. The concurring opinion also found two occurrences, but did so by focusing on the number of "liability-triggering events," finding two occurrences because the claims against *H.E. Butt* arose from two separate acts of abuse.[6]

---

[6]*H. E. Butt*, 150 F.3d at 535 (Benavides, J., concurring). Though I agree with most of Judge Benavides's reasoning, I disagree with his description of Goose Creek as applying a "liability-triggering event" test. *Id*. at 535-36 (citing *Goose Creek*, 658 S.W.2d at 339). *Goose Creek* concerned a loss policy, 658 S.W.2d at 339, and never refers to the insured's liability.

Both opinions focused on the same events, but for different reasons: the majority because those two events caused the injuries to the child, the concurrence because those events triggered the civil liability of the insured. Because the third member of the panel joined in the judgment only, *H.E. Butt*, 150 F.3d at 535, neither opinion's reasoning carries precedential weight.[7]

*Ran-Nan* considered the number of occurrences under an employee dishonesty policy where two employees had separately stolen more than $30,000 each. *See* 252 F.3d at 738, 740. As the majority notes, in *Ran-Nan* we quoted the *H.E. Butt* majority's statement that the court should look to the events "'that cause the injuries and give rise to the insured's liability[.]'" *Id*. at 740 (quoting *H.E. Butt*, 150 F.3d at 530). We went on, however, to cite *Goose Creek* and apply its "cause" test, concluding that there were two occurrences because the losses were caused by two different employees in separate and independent acts of employee dishonesty.[8] We made no

---

[7]The majority argued that the two approaches were not inconsistent. *See H. E. Butt*, 150 F.3d at 530 n.2. The two approaches yielded the same result in that case, but would not in all cases. Though the proper test under liability policies is not before us, I do believe the concurrence is the better statement of the law.

[8]*Ran-Nan* was explicit in its endorsement of the "cause" test.

The few Texas cases that have addressed this issue apply a "cause" analysis in determining whether a set of facts involves one or several occurrences. This "cause"

(continued...)

15

attempt to determine what events "gave rise to the insured's lia-bility." Such an approach has never been utilized when interpreting a loss policy, by this court or any Texas court.

## II.

## A.

Though the majority is correct that *Ran-Nan* quoted from and endorsed the "liability-triggering event" test from *H. E. Butt* and *Pincoffs*, this test has no applicability to the facts at issue here. *H.E. Butt* and *Pincoffs* held that the court should look to the events that gave rise to the liability of the *insured to other parties*. The insured here, Texas One, has no liability *to anyone*. The only liability at issue is the *insurer's* to the insured. As applied to this case, then, this test points to no events at all.[9]

Perhaps influenced by the desire to blend the "liability-triggering event" test with the relevant law as established by *Goose Creek*, the majority suggests that "*Goose Creek* instructs us

---

[8](...continued)
approach to analyzing the number of "occurrences" is utilized by the great majority of courts and jurisdictions nationwide.

*Ran-Nan*, 252 F.3d at 740 (citations omitted).

[9]Similarly, the plaintiffs in *Ran-Nan*, victims of employee theft, had no liability to anyone, which explains why this court, despite citing *H.E. Butt* and *Pincoffs*, made no attempt to apply the "liability-triggering event" test to the facts of that case.

16

. . . to focus on the event that gave rise to Fireman's Fund's liability under the policy." This looks similar to *H.E. Butt*'s admonition to look to the events that "give rise to the insured's liability," *H.E. Butt*, 150 F.3d 530, the difference being, of course, that Fireman's Fund is the insurer defendant, not the insured plaintiff.

The majority's characterization of *Goose Creek* creates a test with no useful meaning. The loss occurrence definition is designed to help the parties determine the event or events that give rise to the insurer's liability. The majority holds that the number of events that cause the insurer's liability determines the number of loss occurrences, creating a circular definition.

B.

Despite the instruction of *Ran-Nan* and *Goose Creek* to find the "cause" of the loss, the majority avoids directly tackling this requirement. It comes closest when it states that "a different leak was responsible for the damage to each building, and as such . . . each leak constitutes a separate occurrence[.]" The loss was caused by the leaks, and, the majority's statement implies, the leaks caused the leaks.

The leaks may have happened as a result of the passage of time and normal wear and tear, eighteen natural occurrences that were

17

not the result of any defect.  Or, as the plaintiff contends, they may have resulted from faulty workmanship or materials.  This dispute is not a question of law.  We must assume, for summary judgment purposes, that the leaks were caused by a single event: the installation of faulty plumbing.  And we have no undisputed evidence of any intervening cause.[10]  It is appropriate, in these circumstances, that a jury resolve the fact question of which event or events caused the damage.

The majority draws analogy to *Goose Creek*, where the court found that two fires could not be considered one event.[11]  The court started with the proposition that the setting of the two fires caused the loss.  The setting of the two fires could not be linked as one event, because the two events were "distinguishable in space

---

[10]Some courts have suggested that an intervening cause might change the number of occurrences.  *See Home Indem. Co. v. City of Mobile*, 749 F.2d 659, 662 (11th Cir. 1988) (finding under Alabama law that "if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place"); *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) (stating that under "cause" test employed in a majority of jurisdictions, "the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage") (internal quotation marks and other punctuation omitted).

[11]*Goose Creek*, 658 S.W.2d at 341.  As the majority appears to concede, *Goose Creek* is the most appropriate case to consider because it involved a loss policy with a definition of loss occurrence that is very similar to the one at issue here.  658 S.W.2d at 640 (defining a loss occurrence as "the total loss by perils insured against arising out of a single event").

18

and time," and "one did not cause the other." *Goose Creek*, 658 S.W.2d at 641.

We must assume that all of the leaks *do* share a single cause. It is not relevant that the leaks did not affect buildings other than the ones above them.[12] Though "one [leak] did not cause the other," Texas One contends they were all caused by the pluming installation, an event not "distinguishable in space and time occurred." Unlike the two fires in *Goose Creek*, the plumbing installation at the nineteen buildings was "part of a process of continuum." *Id*. at 640. The majority notes that the installation was set apart in time from the manifestation of the damage. *Goose Creek*, however, considered the impact of a delay between two causal events "distinguishable in space and time" from each other, not a delay between a casual event and the manifestations of damage.

Although it is instinctively appealing to assume that the lengthy time lag between the plumbing installation and the loss implies a break in the casual chain, nothing in the policy's definition of loss occurrence justifies making this assumption as a

---

[12]These buildings join to form a single apartment complex, built together with, the plaintiff would contend, a single defective plumbing system. The buildings are insured together as a *single* property, and are not far apart as in *Goose Creek*. If this case involved one house, and that faulty plumbing caused damaging leaks in the kitchen and the bathrooms, would the majority find multiple loss occurrences if the leaks in the kitchen did not cause any damage to the bathrooms?

19

matter of law. The Fireman's Fund definition of "loss occurrence" contains no requirement that losses caused by a single event must manifest within a certain time frame compared to each other.

Fireman's Fund has not even argued that the policy will not cover the loss if it arose out of an event that occurred many years earlier.[13] Instead, it suggests that the court should pretend that the event is not relevant, because it took place too long ago. Without some basis in the language of the policy, I see no reason to do so. Taking Texas One's version of the disputed facts to be true, the damage to the nineteen buildings is rightly viewed as one loss occurrence.[14]

---

[13]There is a distinction here between when the losses manifested and when the event that gave rise to those losses occurred. It is a different matter whether the policy covers losses that actually manifest before a certain date. *See Am. Home Assurance Co. v. Unitramp, Ltd.*, 146 F.3d 311, 314 (5th Cir. 1998) (holding that an injury becomes manifest when it is apparent or capable of easy perception). Here, there is no dispute that the losses all manifested during the policy period.

Consider a hybrid between the facts of *Goose Creek* and this case, where an arsonist sets fire to the woods near the Texas One property, eventually causing eighteen buildings on the property to burn down. The court would have little difficulty determining that the fires were all caused by one event, meaning there was one loss occurrence. The court would be unconcerned with whether one building caught fire immediately and was consumed in minutes while another building caught fire hours later and then slowly burned for two days. It also would not matter whether the fire spread directly from the trees to all the buildings independently or whether it had spread from one building to another in a chain.

[14]In *Unity/ Waterford-Fair Oaks, Ltd. v. Fireman's Fund Ins.*
(continued...)

Summary judgment was improper as to this issue. Because it is still disputed whether the leaks were caused by defective workmanship or materials, I would reverse and remand for a factual determination. Accordingly, I respectfully concur in part and dissent in part.

---

[14](...continued)
*Co.*, 2001 U.S. Dist. LEXIS 24818 (W.D. Tex. June 20, 2001), the insured proved nearly identical facts to those alleged by Texas One here. The court concluded that "the damages arising out of the failure of the underground plumbing system constitute a single loss occurrence within the meaning of the Fireman's Fund policy." *Id*. at *6. The case was appealed, but not as to this holding. *See Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks Ltd. P'ship*, 288 F.3d 651 (5th Cir. 2002).